**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.                                    No. 07-4211

CEDRIC LEE BENTON,
            *Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Robert J. Conrad, Jr., Chief District Judge.
(3:05-cr-00105-2)

Argued: January 30, 2008

Decided: April 28, 2008

Before WILKINSON and GREGORY, Circuit Judges,
and Patrick Michael DUFFY, United States District Judge for the
District of South Carolina, sitting by designation.

Affirmed by published opinion. Judge Wilkinson wrote the opinion,
in which Judge Gregory and Judge Duffy joined.

## COUNSEL

**ARGUED:** Raquel Kathy Wilson, Assistant Federal Defender, FED-
ERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC.,
Asheville, North Carolina, for Appellant. Adam Christopher Morris,
Assistant United States Attorney, OFFICE OF THE UNITED
STATES ATTORNEY, Charlotte, North Carolina, for Appellee. **ON**

**BRIEF:** Claire J. Rauscher, Executive Director, Kevin A. Tate, Assistant Federal Defender, FEDERAL DEFENDERS OF WEST-ERN NORTH CAROLINA, INC., Asheville, North Carolina, for Appellant. Gretchen C. F. Shappert, United States Attorney, Charlotte, North Carolina, for Appellee.

---

## OPINION

WILKINSON, Circuit Judge:

Cedric Lee Benton pled guilty to a felony conspiracy charge, and the district court sentenced him pursuant to his plea. Benton now appeals, arguing that the district court erred in not allowing him to withdraw his plea as a matter of right because the magistrate judge was not entitled to accept it. After careful consideration, we reject Benton's claim and affirm the judgment of the district court.

I.

During January 2005, law enforcement officials conducted several controlled purchases of cocaine base from Cedric Lee Benton. These purchases led to Benton's arrest. Benton subsequently revealed his source for cocaine, Daryl Mills, and assisted in a controlled purchase that led to Mills's arrest. On April 25, 2005, Benton and Mills were charged in a nine-count indictment alleging possession with intent to distribute cocaine base and a related conspiracy charge.

On May 3, Benton made his first appearance in court on his indictment. On this date, a magistrate judge explained Benton's charges to him and outlined potential sentencing ranges that he faced.

Subsequently, on July 7, Benton and the government reached a plea agreement. Benton agreed to plead guilty to conspiracy in exchange for the government's dismissal of the substantive possession counts he faced. In his plea agreement, Benton agreed to allow a "duly-qualified federal Magistrate Judge" to perform his plea "hearing required by Fed. R. Crim. P. 11." Benton also stipulated to the fact

that there was a factual basis for the plea, and agreed to defer the court's confirmation of this stipulation until sentencing.

A little over a week later, on July 15, Benton appeared before a magistrate judge for a plea hearing. At the colloquy, Benton again affirmatively consented to a magistrate judge performing his plea hearing and accepting "a guilty plea that cannot later be withdrawn." JA 51. Benton also stated that he understood the charges against him and the penalties he faced if convicted. The prosecutor then recited the terms of Benton's plea agreement, correctly recounting the potential range of Benton's prison sentence (20 years to life). The prosecutor stated erroneously, however, that Benton could be subjected to "no more than five years supervised release," even though Benton actually faced a mandatory minimum of ten years supervised release. The court did not correct this error made by the government.

Following the prosecutor's recital of the plea agreement, Benton confirmed that he understood the terms of his plea, and that he was satisfied with the services of his lawyer. The magistrate judge then accepted Benton's plea, finding it to be both knowing and voluntary.

One month after Benton's guilty plea was accepted, Benton's counsel, Charles Morgan, filed a motion to withdraw his representation, citing "irreconcilable differences." Within a month, he withdrew this motion. Eight months later, in May 2006, Morgan again filed a motion to withdraw. Almost simultaneously, Benton wrote a letter to the district court raising a litany of complaints about Morgan's representation, including that Morgan failed to explain the *mens rea* element of his conspiracy charge to him before he pled.

On June 5, 2006, Morgan filed a response to Benton's letter, addressing its allegations. In particular, Morgan claimed that he did not discuss *mens rea* with Benton because it was "not at issue under the facts and circumstances of this case." The district court subsequently allowed Morgan to withdraw as counsel, and current counsel took over Benton's representation.

After this change in counsel, Benton filed a motion with the district court to withdraw his guilty plea. In his motion, Benton alleged that his plea was accepted without a factual basis, that the plea agree-

ment's terms were unconscionable, that Benton's previous counsel had been ineffective (resulting, *inter alia*, in Benton's plea not being knowing and voluntary), and that the government had breached its obligation to file a motion for downward departure to reward Benton for his assistance in arresting Mills. The district court reviewed the proceedings before the magistrate judge and denied Benton's motion, finding that he had not established a fair and just reason for withdrawing his plea.

On February 5, 2007, Benton appeared before the district court for sentencing. Benton reiterated that he should be entitled to withdraw his plea (for reasons similar to those advanced in his earlier motion), and again the district court rejected his arguments. Ultimately, the district court entered a final judgment based on Benton's plea agreement and sentenced Benton to 262 months in jail and ten years supervised release. At no time before Benton's sentencing did the district court accept Benton's guilty plea.

Benton now appeals the district court's judgment and sentence, raising three claims. First, Benton argues that the district court erred in not allowing him to withdraw his plea. Second, Benton claims that his plea was not knowing and voluntary. Finally, Benton argues that his counsel provided constitutionally ineffective assistance. We address each of Benton's claims in turn.

II.

Benton first claims that the district court erred in denying his motion to withdraw his guilty plea, since, under Rule 11 of the Federal Rules of Criminal Procedure, he had the right to withdraw his plea for "any reason or no reason."

Benton's challenge to the denial of his withdrawal motion centers on the authority of the magistrate judge to "accept" his guilty plea. The magistrate's power to accept a plea is crucial because of the wording of Rule 11(d), which lays out the circumstances under which a defendant may withdraw a guilty plea:

> (d)   A defendant may withdraw a plea of guilty or nolo contendere:

(1)  before the court accepts the plea, for any rea-
son or no reason; or

(2)  after the court accepts the plea, but before it
imposes sentence if:

    (A)  the court rejects a plea agreement under
Rule 11(c)(5); or

    (B)  the defendant can show a fair and just rea-
son for requesting the withdrawal.

Since Benton filed a motion to withdraw his guilty plea before the plea was accepted by the district court, he contends that the scope of the magistrate's authority is of paramount importance. Benton argues that, because the magistrate judge lacked the power to accept a plea for the purposes of Rule 11, the district court should have allowed him to withdraw his plea "for any reason or no reason."

### III.

Before we analyze the merits of whether a magistrate judge may accept a plea for the purposes of Rule 11, we must first consider whether this question is properly before the court. The government contends that Benton never raised a claim based on the authority of the magistrate judge in the district court, and that, instead, Benton moved to withdraw his plea for "fair and just reason[s]" under Rule 11(d)(2)(B). The government thus argues that Benton's "challenge to the magistrate judge's power to accept a guilty plea . . . has been waived." *Brief of Appellee* at 9.

Failure to raise an argument before the district court typically results in the waiver of that argument on appeal. *See United States v. Evans*, 404 F.3d 227, 236 n.5 (4th Cir. 2005); *see also Holland v. Big River Minerals Corp.*, 181 F.3d 597, 605 (4th Cir. 1999) (citing *Singleton v. Wulff*, 428 U.S. 106, 120 (1976)). Parties are likewise deemed to have waived an objection to a magistrate judge's report if they do not present their claims to the district court. *See United States v. Midgette*, 478 F.3d 616, 621-22 (4th Cir. 2007). Moreover, a gen-

eral objection to a magistrate judge's findings is not sufficient — "a party must object to the [magistrate's] finding or recommendation . . . with sufficient specificity so as reasonably to alert the district court of the true ground for the objection." *Id.* at 622 (noting that the Third, Sixth, Seventh, and Tenth Circuits require similar specificity).

In this case, Benton did not present his challenge to the magistrate judge's authority with "sufficient specificity" to preserve his claim. Although Benton began his motion to withdraw his plea by generally referencing "Fed. R. Crim. P. 11 (d)(1) and (2), as well as, the Fifth and Sixth Amendments of the United States Constitution," this sort of general allusion to various legal claims is precisely the sort of pleading that *Midgette* held was insufficient to prevent waiver.

The touchstone of our inquiry must be whether the district court was made aware of the "true ground for [Benton's] objection." We conclude that it was not. Nowhere in his motion to withdraw his plea did Benton claim that the magistrate judge was unauthorized to accept his plea for the purposes of Rule 11. Likewise, nowhere did Benton mention that he should be allowed to withdraw his plea "for any reason or no reason"; instead, Benton specifically states in his motion that "a defendant has no absolute right to withdraw his plea." Indeed, the entirety of Benton's motion to withdraw focused on his "fair and just reasons" for doing so.

Ultimately, Benton simply did not make the district court aware of any concerns he may have had about the magistrate judge's authority, and the district court therefore had no reason to address the issue. As a result, the waiver doctrine, which preserves judicial resources and makes certain that appellate courts have well-formed records to review, requires us to consider Benton's argument waived.[1] *See Mid-*

---

[1]Although Benton claims his challenge to the magistrate judge's authority is an unwaivable jurisdictional argument, it is not properly construed as such. The district court clearly had the jurisdictional authority to sentence Benton, and Benton does not argue otherwise, nor could he.

Instead, Benton's claim is one of traditional legal error. In essence, Benton argues that the district court accorded an improper amount of weight to the plea proceedings conducted by the magistrate judge. His claim is thus analytically similar to any challenge to the district court's acceptance of his plea — challenges that are legal in nature, not jurisdictional.

*gette*, 478 F.3d at 622; *see also United States v. Ciapponi*, 77 F.3d 1247, 1249-50 (10th Cir. 1996) (stating that a defendant did not preserve his challenge to a magistrate judge's authority to conduct a plea colloquy because he raised no objection below).

IV.

Because Benton did not raise his challenge to the magistrate judge's authority below, we review his claim for plain error. *See United States v. Olano*, 507 U.S. 725, 731-32 (1993). Under that decision, Benton must establish the following three elements to demonstrate plain error: (1) that the defect below was, in fact, error; (2) that the error was "plain;" and (3) that the error affected Benton's "substantial rights." *Id.* at 732. And even if Benton is able to demonstrate that all three of these elements are present, a court should not exercise its discretionary authority to "correct the forfeited error . . . unless [it] seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Id.* (internal quotation omitted).

A.

To demonstrate "error" for the purposes of plain error review, a defendant must show that "a legal rule was violated during the district court proceedings." *Id.* at 733-34. After careful consideration, we do not think Benton has made such a showing. For the reasons discussed below, we believe that magistrate judges possess the authority to bind defendants to their plea for the purposes of Rule 11, so long as district judges retain the authority to review the magistrate judge's actions *de novo*.

Questions concerning the scope of a magistrate judge's authority have both statutory and constitutional components. In order to exercise authority over any portion of a federal trial, magistrate judges must first have been granted the statutory authority to do so by Congress. Second, any statutory authority granted to a magistrate judge must be consistent with trial participants' constitutional rights and the structural provisions of Article III.

We consider the scope of a magistrate judge's statutory and constitutional authority in light of the Supreme Court's decision in *Peretz*

*v. United States*, 501 U.S. 923 (1991). In *Peretz*, the Court held that magistrate judges have the authority to supervise *voir dire* in felony proceedings, providing the litigants consent to the magistrate judge's authority. *Id.* at 940.

In reaching this decision, the Court located the statutory authority for magistrates to preside over *voir dire* in the text of the Federal Magistrates Act. *See* Federal Magistrates Act of 1968, Pub. L. No. 90-578, 82 Stat. 1107, codified as amended at 18 U.S.C. §§ 3401-02; 28 U.S.C. §§ 631-39 (2000). The Magistrates Act, which was passed by Congress to ease the rapidly increasing and "overwhelming caseload" burden of many district courts, *United States v. Khan*, 774 F. Supp. 748, 750 (E.D.N.Y. 1991), delineates and circumscribes the scope of magistrate judges' authority. In doing so, the Act explicitly grants magistrate judges a number of specific powers, such as the authority to preside over entire civil, *see* 28 U.S.C. § 636(c)(1), and misdemeanor criminal, *see* 18 U.S.C. § 3401, trials with the parties' consent; the ability to issue certain civil and criminal contempt orders, *see* 28 U.S.C. § 636(e); the "power to administer oaths and affirmations," *id.* § 636(a)(2); and the authority "to hear and determine any pretrial matter pending before the court, except" for eight enumerated dispositive motions, including summary judgment motions, *id.* § 636(b)(1)(A).

Most importantly in *Peretz*, the Act also grants magistrate judges the authority to perform, when directed to do so by district judges, "such additional duties as are not inconsistent with the Constitution and laws of the United States." 28 U.S.C. § 636(b)(3). Since the Magistrate Act does not explicitly grant magistrate judges the power to conduct *voir dire* in felony cases, any authority to do so would have to be located in this residual "additional duties" clause.

In *Peretz*, the Court reasoned that the "generality of the category of 'additional duties' indicates that Congress intended to give federal judges significant leeway to experiment with possible improvements in the efficiency of the judicial process." 501 U.S. at 932. The Court stated therefore that district judges could delegate to magistrate judges duties "comparable in responsibility and importance" to "specified duties assigned to magistrates" elsewhere in the Magistrates Act. *Id.* at 933. Since the authority to conduct an entire civil, *see* 28 U.S.C. § 636(c), or misdemeanor criminal, *see* 18 U.S.C. § 3401, trial (with

the parties' consent) was "comparable" to presiding over *voir dire* at a felony trial (again with the parties' consent), the Court held that the express statutory authority to do the former meant that the latter could be considered an "additional duty" under 28 U.S.C. § 636(b)(3). *Peretz*, 501 U.S. at 933.

*Peretz* then addressed two potential constitutional concerns. First, the Court noted that "it is arguable that a defendant in a criminal trial has a constitutional right to demand the presence of an Article III judge at *voir dire*." *Id.* at 936. However, the defendant's consent alleviates this concern, as the Constitution allows criminal defendants to waive their individual rights. *Id.* at 936-37 (listing numerous precedents that allowed criminal defendants to waive their constitutional rights).

Second, the Court held that magistrate judges presiding at felony *voir dire* did not violate any of Article III's unwaivable "structural protections." *Id.* at 937-39. To begin, the Court noted that district courts retained ultimate control over magistrate judges: district courts have the power to appoint and remove magistrates; the "'ultimate decision'" whether to invoke the magistrate's assistance is made by the district court; and, finally, the "decision whether to empanel the jury whose selection a magistrate has supervised remains entirely with the district court." *Id.* at 937 (quoting *United States v. Raddatz*, 447 U.S. 667, 683 (1980)). The Court also emphasized that a district court would conduct *de novo* review of the magistrate judge's rulings, if one of the parties requested such review. *Peretz*, 501 U.S. at 939.

Therefore, since "the entire process takes place under the district court's total control and jurisdiction, there is no danger that use of the magistrate involves a congressional attemp[t] to transfer jurisdiction [to non-Article III tribunals] for the purpose of emasculating constitutional courts." *Peretz*, 501 U.S. at 937 (internal quotations omitted). A magistrate judge conducting *voir dire* for a felony trial thus does not violate Article III's structural provisions.

## B.

Applying the teachings of *Peretz*, numerous courts of appeals have found that magistrate judges are able to conduct plea colloquies if

directed to do so by the district court and if they do so with the consent of the parties. *See United States v. Osborne*, 345 F.3d 281, 285 (4th Cir. 2003); *see also United States v. Reyna-Tapia*, 328 F.3d 1114, 1118-21 (9th Cir. 2003) (en banc); *United States v. Torres*, 258 F.3d 791, 794-96 (8th Cir. 2001); *United States v. Dees*, 125 F.3d 261, 263-69 (5th Cir. 1997); *United States v. Ciapponi*, 77 F.3d 1247, 1249-52 (10th Cir. 1996); *United States v. Williams*, 23 F.3d 629, 632-34 (2d Cir. 1994). The logic of these decisions is straightforward: "allowing a magistrate judge to supervise *voir dire* proceedings in a felony trial implicates far greater discretion than the" largely "'ministerial function'" played by a court during a plea colloquy. *Osborne*, 345 F.3d at 288, 287 (quoting *Dees*, 125 F.3d at 266). The court in *Williams* made the point well:

> An allocution is an ordinary garden variety type of ministerial function that magistrate judges commonly perform on a regular basis. The catechism administered to a defendant is now a standard one, dictated in large measure by the comprehensive provisions of Rule 11 itself . . . . Further, administering an allocation is less complex than a number of duties the Magistrates Act specifically authorizes magistrates to perform.

*Williams*, 23 F.3d at 632. Thus, under *Peretz*, these courts have found that conducting a plea colloquy could be considered an "additional duty" within the meaning of 28 U.S.C. § 636(b)(3). *See, e.g.*, *Osborne*, 345 F.3d at 288.

Constitutionally, the courts of appeals again followed *Peretz* in finding that magistrate judges could conduct plea colloquies. *See, e.g.*, *id.* at 288-90. Emphasizing both the ultimate control of the district court over the office and activities of the magistrate judge and the litigants' right to seek *de novo* review of the Rule 11 proceedings as a matter of right, the courts found no Article III violation. *See, e.g.*, *id.* at 288-90.

## C.

Benton admits that the "law is clear" on the fact "that magistrate judges may conduct" plea colloquies. *Reply Brief of Appellant* at 8.

Benton contends, however, that this does not answer the question presented by his claim. To this end, Benton argues "that there is an important, not a technical, difference between conducting a plea colloquy and accepting the plea." *Id.* This is because, Benton asserts, a "magistrate judge[ ] can preside" over a plea colloquy, but can only "submit proposed findings and conclusions of law . . . to the district court for approval" as to a plea acceptance. *Id.* But Benton's assertion simply begs the question — it does not explain *why*, as a matter of law, a magistrate's acceptance of a plea should be considered different from his conducting a plea colloquy.

Certainly, Benton's distinction between plea colloquy and plea acceptance does not appear to necessitate different results under *Peretz*. The "comprehensive provisions of Rule 11" not only "carefully explain what a court must inquire about" and "what [a magistrate] should advise a defendant" of, but they also detail "what [a magistrate] should determine before accepting a plea." *Williams*, 23 F.3d at 632. Thus, the acceptance of a plea is merely the natural culmination of a plea colloquy. *See, e.g.*, *id.* Much like a plea colloquy, plea acceptance involves none of the complexity and requires far less discretion than that necessary to perform many tasks unquestionably within a magistrate judge's authority, such as conducting felony *voir dire* and presiding over entire civil and misdemeanor trials. It is thus difficult to see how a plea acceptance is not comparable in responsibility and importance to a plea colloquy, and therefore an "additional duty" within the Supreme Court's interpretation of 28 U.S.C. § 636(b)(3).

Moreover, a magistrate judge's acceptance of a plea, with the consent of the parties, does not appear to present any constitutional problems, either generally or in this case. *Peretz* and the plea colloquy cases discussed earlier make clear that a defendant's consent waives any individual right to demand an Article III tribunal. In this case, Benton affirmatively consented to the magistrate judge performing his Rule 11 plea proceeding, consented to the magistrate judge accepting his "guilty plea that cannot later be withdrawn," and never objected to the magistrate or the district judge as to the magistrate's power to take his plea. Thus, Benton has no individual constitutional claim.

Likewise, the district court's ultimate control over the magistrate's plea acceptance satisfies any Article III structural concerns in pre-

cisely the same manner it would in *Peretz* or the plea colloquy cases. Benton presents no evidence that district judges are unable to exercise effective oversight of a magistrate judge's acceptance of a felony plea. Defendants with substantive or procedural concerns about their plea proceedings before a magistrate judge are entitled to *de novo* review in the district court. While the standard of review is *de novo*, the substantive rule of decision is whether the defendant has established a "fair and just" reason to withdraw his plea after the magistrate judge has accepted it. A "fair and just" reason would obviously include a defective plea proceeding before the magistrate judge. *See United States v. Bowman*, 348 F.3d 408, 414 (4th Cir. 2003) ("The most important consideration in resolving a motion to withdraw a guilty plea is an evaluation of the Rule 11 colloquy at which the guilty plea was accepted.").

This case underscores the role district courts play in protecting the structural integrity of Article III. In this case, Benton had ample opportunity to raise any concerns he had over his magistrate-conducted plea proceeding with the district judge. In fact, the district court reviewed *de novo* Benton's claims that his plea (taken by a magistrate) was not supported by a factual basis, unconscionable, the result of ineffective assistance, and breached by the government.

Furthermore, we note the practical drawbacks of adopting Benton's position. Benton, in essence, is asking us to grant defendants a dry run or dress rehearsal — a procedure in which a defendant can agree to a plea before a magistrate judge, and then withdraw that plea without any complaint that the Rule 11 hearing was deficient in any way.

This, of course, risks rendering plea proceedings before magistrate judges meaningless. *See United States v. Hyde*, 520 U.S. 670, 677 (1997) (noting, in a slightly different setting that, "[w]ere withdrawal automatic in every case" for any reason, "the guilty plea would become a mere gesture, a temporary and meaningless formality" (internal quotation omitted)). In cases where a defendant withdraws his plea for no reason, the proceedings before the magistrate judge will have been rendered a nullity — a complete waste of judicial resources. In fact, making Rule 11 hearings non-binding may encourage defendants to use magistrate-led colloquies as go-throughs in order to gauge whether they may later experience "buyer's remorse."

The government contends that embracing Benton's position would "remake plea-taking procedure . . . throughout the United States." *Brief of Appellee* at 12. One need not subscribe to such a dramatic formulation in order to foresee the negative consequences that could result from adopting Benton's view. Those district courts that currently employ magistrate judges to conduct plea hearings might feel pressure to revisit their plea procedures. Perhaps district courts could stop delegating plea hearings to magistrates. But such a change would only exacerbate the docket tensions already felt by district courts — the very tensions that led to the creation of the office of magistrate judge. We are most reluctant to compel district courts to remake plea-taking procedures in this way.

We thus find that the district court did not commit error in refusing to allow Benton to withdraw his plea "for any or no reason." Many different reasons support the conclusion that the acceptance of a plea is an "additional duty" under 28 U.S.C. § 636(b)(3) and *Peretz*. To wit, acceptance of a plea is a duty that does not exceed the responsibility and importance of the more complex tasks a magistrate is explicitly authorized to perform, the parties have consented to the procedure, and the ultimate control of the district judge over the plea process alleviates any constitutional concerns. And just as a practical matter, allowing magistrate judges to accept pleas for the purposes of Rule 11 preserves judicial resources — the very goal underlying the creation of the office of magistrate judge — and prevents litigants from exploiting bifurcated plea procedures.

## D.

Since Benton is unable to demonstrate any "error," we find that he fails to meet even the first prong of the plain error standard. Moreover, Benton is also unable to meet at least two of the other requirements necessary to demonstrate plain error.

First, any error committed by the district court certainly does not rise to the level of plain error. Plain error must be "'obvious'" and "clear under current law." *Olano*, 507 U.S. at 734 (quoting *United States v. Young*, 470 U.S. 1, 17 n.14 (1985)). Given the arguments

detailed above in support of the district court's position, any error the district court committed was certainly neither "obvious" nor "clear."[2]

Second, we also note that, were there any error in this case, it would not "seriously affect the fairness, integrity or public reputation of judicial proceedings." There is no question as to Benton's guilt, and the district court reviewed *de novo* all of Benton's claims concerning his plea proceedings. Moreover, Benton himself consented to the magistrate judge presiding over his plea. Thus, Benton has not presented the sort of "exceptional circumstances" that would lead this court to overlook his failure to raise his objection before the district court. *United States v. Atkinson*, 297 U.S. 157, 160 (1936).

## V.

Benton next claims that his plea was not knowing and voluntary. Benton raised this claim with the district court before his sentencing, and the district court rejected it, finding that Benton had not presented a fair and just reason to withdraw his plea. We review the district

---

[2]Benton directs us to the Ninth Circuit's recent decision in *United States v. Reyna-Tapia*, 328 F.3d 1114 (9th Cir. 2003) (en banc). In *Reyna-Tapia*, the Ninth Circuit held that a magistrate judge possesses the authority to conduct a plea colloquy. In doing so, the court noted that it felt comfortable recognizing that a magistrate judge possessed this authority because of the existence of several "procedural safeguards," including the fact that "defendants have an absolute right to withdraw guilty pleas taken by magistrate judges at any time before they are accepted by the district court." *Reyna-Tapia*, 328 F.3d at 1121. The court found support for this statement in two earlier Ninth Circuit cases. *See United States v. Alvarez-Tautimez*, 160 F.3d 573 (9th Cir. 1998); *United States v. Washman*, 66 F.3d 210 (9th Cir. 1995).

While we recognize that *Reyna-Tapia* and the earlier Ninth Circuit cases offer support for Benton's position, we do not feel compelled to follow them. In none of these cases did the Ninth Circuit consider at length the question we confront here: whether the magistrate judge has the power to accept a plea for the purposes of Rule 11. Likewise, Benton directs us to no case in which the Ninth Circuit has performed a *Peretz* analysis to specifically determine whether the acceptance of a plea is an "additional duty" under 28 U.S.C. § 636(b)(3). We thus do not find these cases dispositive in the matter before us.

court's decision for abuse of discretion. *See United States v. Ubakanma*, 215 F.3d 421, 424 (4th Cir. 2000).

Rule 11(b)(1) of the Federal Rules of Criminal Procedure states that, for a court to accept a plea, it must inform the defendant of, *inter alia*, "the nature of each charge to which the defendant is pleading" and "any maximum possible penalty, including imprisonment, fine, and term of supervised release." Fed. R. Crim. P. 11(b)(1)(G) & (H). Benton argues that the court in this case failed to meet both of these requirements.

First, Benton claims that he was never made aware of the elements of the conspiracy charge to which he pled or "the concept of vicarious liability for drugs trafficked during the conspiracy." *Brief of Appellant* at 20. Second, Benton contends that he was informed "that the maximum term of supervised release was five years," despite the fact that Benton faced a mandatory minimum of ten years supervised release. *Id.* at 20-21.

We find Benton's arguments to be without merit. First, Benton was clearly informed of the nature of the conspiracy charge to which he pled. As Benton recognizes, this court's decision in *United States v. DeFusco*, 949 F.2d 114 (4th Cir. 1991), establishes the standard under which we evaluate a court's compliance with Rule 11(b)(1)(G): a "defendant must receive notice of the true nature of the charge rather than a rote recitation of the elements of the offense." *Id.* at 117.

There is ample evidence in the record to indicate that Benton was sufficiently aware of the nature of his conspiracy charge. While it is undoubtedly true that Benton initially did not understand his conspiracy charge (during his initial appearance before the court on his indictment), the court promptly re-explained the charge to Benton when he expressed a lack of understanding. Immediately after this second explanation, Benton asked a very specific question about the charge — who his conspirators were, a fact that could not be revealed because the indictment was under seal — demonstrating his understanding of "the nature" of conspiracy. Moreover, Benton confirmed this understanding by affirmatively representing at his plea colloquy that he understood his conspiracy charge, and the consequences of his guilty plea.

Second, while Benton was certainly misinformed as to the potential length of his supervised release, any error on this front was harmless. In a similar case, the Seventh Circuit considered whether a defendant's plea was rendered invalid by the trial court's "fail[ure] to inform her of the effect of supervised release" on her sentence, despite the fact that the defendant ultimately received an overall sentence (including prison time and supervised release) within the statutory sentencing range communicated to her. *United States v. Schuh*, 289 F.3d 968, 974 (7th Cir. 2002). Terming the claim "frivolous," the court rejected the defendant's argument. *Id.*

We now do the same here: Benton ultimately received the statutory minimum amount of supervised release, and a total sentence (including prison time and supervised release) below his statutory maximum of life imprisonment, and within the sentencing range of 20 years to life communicated to him at his plea colloquy. Simply put, it does not constitute reversible error to inadvertently misinform a defendant of the length of his term of supervised release, so long as his overall sentence fits within the sentencing range communicated to him at his plea colloquy.

## VI.

Finally, Benton claims that his counsel was constitutionally ineffective. In particular, Benton argues that his "original trial counsel failed to explain key concepts" to him — specifically that of *mens rea* — and, that, absent this failure, "it is reasonably probable" that he would not have pled guilty. *Brief of Appellant* at 26.

Under the Supreme Court's well-known *Strickland* test, to establish a Sixth Amendment claim for ineffective assistance of counsel a defendant must show (1) objectively unreasonable performance and (2) prejudice stemming from that performance. *See Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Ineffective assistance claims are generally not cognizable on direct appeal, however, "unless it conclusively appears from the record that defense counsel did not provide effective representation." *United States v. Richardson*, 195 F.3d 192, 198 (4th Cir. 1999) (internal quotations omitted).

Benton can make no such showing in this case. Benton's original counsel states that he did not discuss *mens rea* with his client because

it was "not at issue under the facts and circumstances of this case" — a case in which the government had both Benton's admission that he participated in drug trafficking and extremely strong evidence of Benton's guilt (from undercover controlled purchases). Benton does not dispute this assertion other than to baldly claim that he would not have pled guilty if he had discussed *mens rea* with his counsel. This bare assertion does not provide "conclusive evidence" of either objectively unreasonable performance or prejudice, and we therefore reject Benton's claim.

## VII.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.